1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA     :    06-CR-615
 4
         -against-                     U.S. Courthouse
 5                                :
                                       Brooklyn, New York
 6   SAHILAL SABARATNAM
     THIRUTHANIKAN THANIGASALAM
 7
                   Defendant     :
 8                                     January 12, 2010
     - - - - - - - - - - - - - - - - X    11:00 a.m.
 9

10   BEFORE:
              HONORABLE RAYMOND J. DEARIE
11              United States District Judge

12

13   APPEARANCES:

14   For the Government:        BENTON J. CAMPBELL, ESQUIRE
                                United States Attorney
15                              271 Cadman Plaza East
                                Brooklyn, New York 11201
16                              BY:  MARSHALL L. MILLER
                                     ANDREW EDWARD GOLDSMITH
17                                   Assistant U.S. Attorneys

18
     For the Defendant:         CHRISTOPHER L. PATELLA
19   S. Sabaratnam             203 Broadway
                                Bayonne, New Jersey 07002
20

21   For the Defendant:         LEE GINSBERG
     T. Thanigasalam           30 Vesey Street
22                              Suite 100
                                New York, New York 10007
23

24

25
```

2

| | |
|---|---|
| 1 | Court Reporter: |
| 2 | |
| 3 | |

1    Court Reporter:          RONALD E. TOLKIN, RMR, CRR
                              Official Court Reporter
2                             225 Cadman Plaza East
                              Brooklyn, New York 11201
3                             718-613-2647

4

5                             ***

6

7              THE CLERK:  Can I ask the attorneys to come to the

8     podium.

9              We are on this morning for a sentencing conference.

10    This is U.S.A. versus Sabaratnam and Thanigasalam.  Docket

11    number 06-CR-615.  This is on superceder two.  And Defendant

12    Sabaratnam and Defendant Thanigasalam.

13             Can I ask the attorneys, please, to note their

14    appearances, starting with the government.

15             MR. MILLER:  Marshall Miller and Andrew Goldsmith

16    for the government.

17             Good morning, Your Honor.

18             MR. GINSBERG:  Lee Ginsberg appearing for

19    Mr. Thanigasalam.

20             Good morning, Your Honor.

21             MR. PATELLA:  Good morning, Your Honor.

22             Christopher Patella on behalf of Sahilal Sabaratnam.

23             THE COURT:  Good morning, Mr. Patella.  And welcome

24    to the case.

25             MR. PATELLA:  Thank you, Judge.

1        THE COURT:  As I was preparing a couple of weeks

2  ago, it occurred to me that this is one of those cases where I

3  should afford the lawyers an opportunity to address some of

4  the issues that have been raised.  That's particularly

5  appropriate now as we have a new lawyer in the case, who comes

6  in at an unusual time, I think it is fair to say.

7        I have a sentencing memorandum prepared by

8  Ms. Sternheim which I read a couple of times.  And now, at

9  this somewhat odd hour, we have new counsel.  Certainly not

10  faulting anyone by making that observation, but it puts a

11  little kink in our schedule.

12        Mr. Patella, what exactly is your plan vis-a-vis

13  your client?

14        MR. PATELLA:  Judge, my plan, as requested by my

15  client, is to handle the sentencing of Mr. Sabaratnam.  I had

16  an opportunity to review the sentencing memo that was

17  forwarded to Your Honor by Bobby Sternheim, and both I and my

18  client are willing to stand by that memorandum.

19        THE COURT:  So it's not your intention to submit any

20  additional materials?

21        MR. PATELLA:  No, Judge.

22        THE COURT:  Okay.  Well, with that said, I had a

23  similar conference yesterday with co-counsel.  I sort of

24  prefaced it all by just, obviously we're talking about serious

25  numbers here with respect to each of these defendants.  There

1   is the 25 year mandatory minimum and we have the government

2   pushing very hard for a sentence substantially in excess of

3   that.

4          Counsel raised some guidelines issues, principle

5   among them is the terrorist adjustment and the Chapter 3 of

6   the guidelines.  And the argument that it is, with respect to

7   some or all of the charges, effectively a double counting.

8          Let me throw it open to you with one additional

9   question in mind for the government:  If my recollection

10  serves me correctly, and that's a risky proposition to begin

11  with, there was a time, was there not, when the 25 year

12  mandatory minimums were not in the case?

13         MR. MILLER:  That is correct, Your Honor.

14         THE COURT:  The decision to supercede, was that a

15  product of additional evidence having been developed, you

16  certainly you had the tape of the critical meeting, part and

17  parcel of the plea discussions, or can you shed any light on

18  that for me.

19         MR. MILLER:  I think so, Your Honor.  Although, I

20  wasn't in the case at the time but I think I have a sense for

21  the sequence of events.

22         THE COURT:  I could add, by way of observation, I

23  also seem to recall some vague references, and I mean vague,

24  by counsel, during one of our many conferences, to the effect

25  that the parties, prior to the superceding, were in

1    discussions of some sort or another.

2              MR. MILLER:  That is correct, Your Honor.

3              THE COURT:  That's why I asked the question.

4              MR. MILLER:  Understood, Your Honor.

5              I think the sequence of events, essentially, was

6    that at the time of the arrest and initial charging, the

7    2332(g) statute, the one that carries the 25 year mandatory

8    minimum, was a statute that had been rarely used; it was

9    pretty new.

10             And after a period of time of careful review of the

11   case, in consultation with prosecutors in the arena and a

12   review of the charging options resulted in a determination

13   that a 2332(g) charge would be appropriate on the facts.  And

14   then, at that point, there had already been some plea

15   negotiations.

16             Additional plea negotiations were engaged in with

17   that as a possible charge that would be leveled if plea

18   negotiations couldn't result in a disposition of the case.  No

19   disposition was arrived at, and a superceding indictment was

20   returned by the grand jury including that charge.

21             So to answer your question directly, Your Honor, it

22   was not the product of new evidence so much as a review of the

23   evidence and a review of the charging decisions at a point as

24   the case developed.

25             THE COURT:  Would it be fair to say that had a

1   disposition evolved during that pre-superceder, we wouldn't be

2   quite in the position that we are in today?

3           MR. MILLER:  Well, I think, Your Honor, the idea was

4   to -- if there had been a resolution of the case, as in all

5   cases involving plea dispositions with multiple parties, with

6   voluminous efforts that would be required to prepare a case

7   for trial, and with the specter of additional mandatory

8   minimum charges, whether it be prior felony narcotics

9   information in a different kind of case or a 25 year mandatory

10  minimum in this kind of case, all of those factors come into

11  play.

12          That's a long way of saying, yes, the resolution

13  would not have likely been to a mandatory 25 year minimum

14  charge.

15          Although, I would also just add, Your Honor, that

16  neither I nor the U.S. attorney has the authority in these

17  kinds of cases to resolve a case as we do in other spheres.

18  Any resolution of the case would have required the approval of

19  the National Security Division and the assistant attorney

20  general in charge of that division.

21          And so while there were feelers and discussions, we

22  never got to that point of running it through that division.

23  So I don't know the answer.

24          THE COURT:  Okay.  Well, I appreciate your somewhat

25  forthrightness in a loquacious way.

1        All right.

2        MR. GINSBERG:  Would Your Honor like me to address

3   that issue?

4        THE COURT:  Sure.  I was just going to throw it open

5   to anything you wanted to discuss today.

6        MR. GINSBERG:  I realized when you asked the

7   question, that I'm probably in a unique position to have been

8   the only lawyer standing before Your Honor who was present

9   throughout the case and took part in the negotiations, and

10  become aware that there was a superceding indictment.

11  Hopefully my recollection of those proceedings is relatively

12  accurate.

13        What did take place is that there initially was an

14  attorney proffer, is what I recollect, made on behalf of not

15  my client or Mr. Sabaratnam, who are present before you, but

16  on behalf of another defendant to the government.

17        Based upon that proffer, I had a discussion with the

18  government, as did Ms. Sternheim.  Based upon the responses

19  that we received from the government and discussing it with

20  our clients, we believed that, in good faith, there would be

21  value in having a meeting with the government to discuss the

22  case, to discuss a resolution of the case.  And frankly, to

23  effectively lay our cards on the table.  Which we did do.

24  Subsequent to that there was a superceding indictment that was

25  attacked.

1           The question that Your Honor poses today to the

2    government was the question that I posed to the government at

3    the time the superceding indictment was returned.

4    Effectively, that is, since you had all the evidence at the

5    beginning of the case that you now have, and nothing's been

6    added, how is it that the superceding indictment with a 25

7    year mandatory minimum has now been returned?

8           And isn't it curious, and wouldn't you expect the

9    defense lawyer in the position that I'm in to be concerned

10   that this occurred subsequent to plea negotiations that were

11   not typical?

12          They weren't simply telephone calls asking for a

13   draft plea agreement to be sent over.  They were full blown

14   meetings that took maybe an hour and-a-half to two hours,

15   where everything was laid out.  So that is the history of the

16   case.

17          Mr. Miller was correct in terms of telling the Court

18   that there was nothing new, and I believe that was what I was

19   told at the time.

20          I was also told, by the government, at the time,

21   that the government always sees fit to bring the highest

22   possible charge that they can against defendants when the

23   facts support that charge.  Which, again, at the time, was

24   curious to me since that charge could have been brought much

25   sooner.  It wasn't.

1          I recognize that the government has discretion to

2     supercede when they wish to supercede; however, the way that

3     this played out was not in the normal course of events that

4     I'm familiar to.

5          And also, I can tell the Court that it was not as if

6     the government had come to us and said, If you do not plead

7     guilty to the charge that was before the court at the time,

8     that is, two 15 year counts, we are going to charge you with a

9     25 year mandatory minimum.

10          That was told to us maybe right before the

11     indictment was returned, but it wasn't part and parcel of the

12     plea negotiations that we had entered into.  It didn't come up

13     until after those plea negotiations.

14          In fact, I'm not sure that we would have entered

15     into those plea negotiations, and had those meetings, and set

16     forth our defense at the time, had we believed that the next

17     step was going to be a superceding indictment which could be

18     placed at the feet of the lawyers representing the defendants

19     for going in, laying out the defense, and now causing a

20     superceding indictment to be returned to which the defense was

21     displayed to the government.

22          So that's my recollection of what happened.  And I

23     was fairly concerned, and made that known to the Court on at

24     least one occasion after the superceding indictment was

25     returned.  The government, in its submission to the Court -- I

1   think in its second submission to the Court.

2         THE COURT:  The second sentencing submission.

3         MR. GINSBERG:  The second sentencing submission to

4   the Court doesn't directly address the issue.  But it does, I

5   think, effectively address the issue by suggesting, when it

6   talks about disparity among sentences, particularly pointing

7   to the sentences in Maryland.

8         The government does mention that different districts

9   see cases differently, and have the option and the right to

10  bring the charges they see fit to bring.  And they sort of

11  bundle that in with a number of other issues.

12        But principally, I believe it was addressing a

13  disparity argument that had been brought up by one of my

14  colleagues.  And when I saw that in their submission, it

15  reminded me of the history of this case, and how and when the

16  additional charge with the 25 year mandatory minimum was

17  brought against those defendants.

18        MR. MILLER:  Your Honor, if I can just comment on

19  that briefly.  The first thing I would say is that my

20  recollection differs somewhat from Mr. Ginsberg, particularly

21  with respect to the notice given about the coming superceding

22  indictment.

23        My memory is of clear discussions of, This is coming

24  because we have rereviewed the evidence and we have rereviewed

25  the statutes, and we have determined that this is an

1   appropriate and applicable statute to this conduct.  As a

2   result, we're giving you notice of that.  We're happy to

3   engage in additional plea negotiations with that backdrop.

4        And we did engage in additional plea negotiations

5   with that backdrop, including additional offers back and forth

6   in a preliminary way.  Again, without the approval of the

7   people who needed to be approved.  And there were many

8   discussions about that as well.

9        I don't really want to delve too deeply into plea

10  negotiations, other than to point out that a lot of notice was

11  given.  There was a lot of discussions.  There was some

12  feelings that Mr. Ginsberg expressed which I don't think are

13  valid, from the government's point of view, such as the idea

14  that the defense was displayed.

15       As a matter of fact, the government had reviewed and

16  translated phone calls from the individual, Mr. Sarachandran,

17  who was supposedly going to put forward what turned out to be

18  a baseless defense of duress.

19       THE COURT:  Is that the defense was referring to?

20       MR. GINSBERG:  That was one of the defenses, Your

21  Honor.  And the government, after -- during the plea

22  negotiations, that was not something that the government

23  shared with defense counsel.

24       MR. MILLER:  We turned it over in discovery, Your

25  Honor.  So...

1          MR. GINSBERG:  That was given to us at a later time.

2          THE COURT:  That was going to be my next question.

3   To what extent -- when you said defense, I wasn't thinking in

4   terms of that purported duress defense, to call it that for

5   lack of a better way of describing it, but did that trigger

6   the inclination to supercede?  That only implicated two of the

7   defendants, if I'm correct.

8          MR. MILLER:  Well, one defendant.  But the other

9   defendants were arguing some form of derivative duress.  So I

10  think it ended up including three defendants in some form of

11  that potential defense.

12          Your Honor, I mean, what was going on during that

13  period was a review of dozens and dozens of hours of

14  recordings.  There was not only the two plus hour videotape

15  where some of the conversations were in Tamil, there was

16  ongoing efforts to decode and translate those discussions.

17          But there was also the usual efforts to take what is

18  hours of video, and dozens and dozens of audio recordings,

19  much of which were in a foreign language, or some of which

20  were in a foreign language and try to figure out what is on

21  there.  And then, also, whether it satisfies all of the

22  elements of various statutes.

23          So, yes, the evidence was largely garnered, with the

24  exception of some additional materials which were obtained

25  from the Canadian authorities, some of which were valuable

1    pieces of evidence.  As well as phone calls where, to use a

2    blunt term, there was obstructive conduct going on in terms of

3    inventing a nonexistent defense, which was also being

4    translated from Tamil.

5            So there was a lot of work going on.  And while the

6    evidence was 95 percent, 90 percent there, it wasn't always

7    there in the most useable format.  And as that evidence was

8    sorted through, much of it translated, the case took on a

9    slightly different shape.

10           And, again, when it was rereviewed with the

11   developing record --

12           THE COURT:  I'm not questioning that.  Certainly,

13   though, you had the video before the original charges.

14           MR. MILLER:  Yes, Your Honor.

15           THE COURT:  And presumably a translation of the

16   video.

17           MR. MILLER:  Yes.  A draft transcription.  Not a

18   translation of the Tamil parts.

19           But if Your Honor wishes, there was a lot of

20   interesting information yielded from the Tamil portions that

21   suggested strongly that these individuals were -- that the

22   defendants were talking with high level folks in the LTTE.

23           THE COURT:  You alluded, a few minutes ago, in a

24   different context, to the fact that the department, this is

25   one of those rare instances where the department would have to

1    approve disposition and so forth.  Were the original charges

2    screened and approved by the department.

3              MR. MILLER:  Yes, I believe they were.  Although, I

4    wasn't on the case.  They should have been and I believe they

5    were.

6              THE COURT:  So they approved of your original

7    indictment and then ultimately approved of your superceder?

8              MR. MILLER:  They definitely approved the superceder

9    because I was involved in that portion.  And I believe they

10   approved the original charges as well.

11             THE COURT:  Well, you understand why I ask.  You're

12   pushing very hard for a sentence substantially in excess of 25

13   years.  I think it's instructive and relevant to know the

14   dynamics, particularly given my slightly flawed recollection

15   of it.

16             MR. MILLER:  Yes, Your Honor.

17             I think that the two developments that took place

18   over time, from a factual perspective -- putting aside the

19   legal analysis of the applicable statutes, but from a factual

20   standpoint, where what the government viewed as obstructive

21   conduct in connection with the defenses and what the

22   government learned from some of the Tamil portions, and some

23   of the efforts in going through the transcripts with a fine

24   tooth comb, some of the references which made clear were that

25   these individuals were talking with or representing themselves

1    as having conversations with very high level people in the

2    foreign terrorist organization, the LTTE.

3            That is, all the way up to the leader, Prabhakaran,

4    and its -- for want of a better term, its intelligence and

5    sort of external operation.  You know, the people who were

6    gathering information from abroad, funds from abroad.  People

7    of a very high level, top leaders of the LTTE.

8            MR. GINSBERG:  Your Honor, I don't want to beat this

9    to death.  Mr. Miller's first point is probable accurate;

10   obviously there was a defense that was proffered.  First by a

11   codefendant and we adopted it as a potential derivative

12   defense.

13           THE COURT:  Yes.

14           MR. GINSBERG:  But as to his second point, he's just

15   clearly wrong.  They had an informant present at the meeting

16   with the agents who spoke Tamil.  They knew, as soon as that

17   meeting was over, when that informant was debriefed, who was

18   spoken about at the meeting, who these high level people were.

19   There was a phone call that was supposedly made during the

20   meeting to a high level person.  The government knew that

21   information immediately.  They knew it before --

22           THE COURT:  I don't know that that necessarily

23   conflicts with what Mr. Miller is saying.

24           MR. GINSBERG:  What Mr. Miller is suggesting is that

25   as the case evolved and as they looked at these tapes further,

1   and as they got more translations of these difficult Tamil

2   conversations, they were able to get a different view of the

3   nature of the case.

4           What I'm suggesting to the Court is that there was

5   an informant present at the initial meeting who was present at

6   meetings that were held before the videotaped meeting.  Who,

7   obviously, was in a position to, and I'm certain, translated

8   for the agents.  And if required, for the assistance of what

9   was said during the videotaped meeting and during the phone

10  call.

11          So to the extent that the argument is being made, We

12  didn't know that information until it was translated for us,

13  and that didn't happen until a year later, I find that very

14  difficult to accept.

15          THE COURT:  I, again, don't know that you're in

16  conflict.  Mr. Miller has already acknowledged there was some

17  leveraging of that 25 year count when it came to those briefs.

18  It's almost as a matter of common sense that one can conclude

19  that.

20          What else is it that you'd like to address today?

21          MR. MILLER:  Your Honor, there is one issue that I

22  would like to raise from yesterday's conference.  I just want

23  to make sure I understood the Court's focus.  And that is, we

24  discussed yesterday, and I had spoken to Mr. Ginsberg about

25  the Court's focus, and Your Honor mentioned it a few minutes

1    ago, the focus on the double counting issue.

2           Yesterday I had taken it that the Court's focus was

3    on the potential double counting between the 2339(b)

4    convictions; the material support.

5           THE COURT:  There is a stronger argument to be made

6    with respect to some counts, not others.

7           MR. MILLER:  Yes, Your Honor.

8           And we had talked yesterday, and I informed counsel

9    that we were planning to submit a letter that spent a little

10   more time on that issue.

11          What I wanted to get at was, I think Your Honor is

12   correct that there's a stronger argument in the 2339(b)

13   context, and we're prepared to rebut it.

14          And we think it's ultimately not impermissible,

15   double counting, but we wanted to see whether Your Honor wants

16   us to focus also on the 2332(g) count, the Anti-Aircraft

17   Missile count.

18          Where it seems, to the government at least, that

19   that conduct is quite different from the terrorism

20   enhancement, given that conduct would apply to arms dealers,

21   would apply to all manner of people who might be involved in

22   the sale or purchase of Anti-Aircraft Missiles.  It could be

23   for foreign governments, could be --

24          THE COURT:  I understand your point, but I make it a

25   strict policy not to tell what you to do.

1          MR. MILLER:  Okay.  Fair enough, Your Honor.

2          MR. GINSBERG:  It's a good policy to have.

3          THE COURT:  It keeps me out of trouble sometimes.

4          Mr. Ginsberg, anything you want to get into today?

5          MR. GINSBERG:  If the government is going to put in

6    a response, I think it's just prudent that I wait.  I'll see

7    what their response is.  I raised it in my papers.  I may have

8    been -- I don't know if I was the first one to raise it, but I

9    raised those issues.

10         THE COURT:  At this point, I couldn't tell you.

11   I've read so many submissions.

12         MR. GINSBERG:  Fair enough, and I'll respond.

13         If we're going to have another opportunity to

14   address the broader issues, the 3553 type issues, I'll reserve

15   those for that day.

16         THE COURT:  Yes.

17         MR. GINSBERG:  I would like to just mention to the

18   Court, since we had a discussion just a couple moments ago

19   about how the plea negotiations proceeded:  There was a

20   footnote that was placed in one of the sentencing submissions

21   by one of my colleagues which seemed to suggest that his

22   client was sort of held back from --

23         THE COURT:  I know what you're referring to.

24         MR. GINSBERG:  -- going forward.

25         And I simply have to say, and I've never been in a

1  position to have to do this before, that simply wasn't the

2  case.  If anything, the evidence that has been presented to

3  this Court with the telephone conversations from the jail that

4  were transcribed, among other things, suggests otherwise.  And

5  I don't want to really elaborate further.

6         THE COURT:  I don't know that you need to.  I do --

7  and Ellie will probably remember this better than I do, but do

8  I accurately recall some sort of failed attempt by one

9  defendant to dispose of the case before the superceder?  I

10  don't know if it's particularly germane.

11         MR. GINSBERG:  There was a discussion, which I think

12  first Mr. Sabaratnam had with the government about pleading

13  guilty to possibly one of the 15 year counts.  And once we

14  learned of that, that's when we were involved in the

15  discussions with the government to see if that was something

16  that would be available to us.

17         And we were discussing whether or not it could be a

18  plea to one count as opposed to two counts.  We had our

19  meeting with the government, and subsequently that became

20  unavailable to us.  There was not a formal offer made, but it

21  was something that was being discussed.

22         However, we subsequently learned that these

23  telephone conversations, which were then turned over to us,

24  had been made at a time that was earlier than that plea

25  discussion.

U.S.A. v. SABARATNAM and THANIGASALAM                    20

1          THE COURT:  It seems so.

2          MR. GINSBERG:  And those telephone conversations

3    were between one defendant and his family.

4          THE COURT:  Okay.  When will you have your

5    submission?  When will I have your submission?

6          MR. MILLER:  I think that we'll certainly get it to

7    Your Honor by the end of the week.  I'd like to try to get it

8    to Your Honor by the day after tomorrow.

9          THE COURT:  As long as I have it this week, then

10   I'll have a plea reply from you fellows and your colleagues.

11         MR. GINSBERG:  Well, I can't speak for my colleagues

12   for sure.  They've spoken for me in this case in a number of

13   ways, but I think we can have it to Your Honor by the middle

14   of next week.

15         THE COURT:  That's fine.

16         Anything else you want to get into today?

17         Certainly, the 3553, I think, is more appropriately

18   reserved for the day of sentencing.  I have read it, now more

19   times then I'm prepared to acknowledge, these various

20   submissions.

21         There was a lot of talk, of course, about Judge

22   Blake's case in the District of Maryland.  The government has

23   attempted to, I would say that in the pejorative sense, has

24   addressed it.  I take it that case and those charges were,

25   likewise, for lack of a better word, supervised or were

1   authorized by the department as well?

2           I'm not trying to be cute here.

3           MR. MILLER:  Understood, Your Honor.

4           And I'm operating a little bit on hearsay in

5   connection with what happened in Maryland.  So I'm a little

6   reluctant to discuss what happened in Maryland on the record.

7           THE COURT:  Let's stay away from hearsay.

8           MR. GINSBERG:  In any event, we know that the judge

9   was not taking direction from the department of justice.

10          THE COURT:  Let's hope that's the case here in

11  Brooklyn as well.

12          MR. GINSBERG:  That I know.  And I would expect the

13  same existed in the District of Maryland.

14          THE COURT:  I am comforted to hear your assessment.

15          Mr. Patella, anything you want to add here?

16          MR. PATELLA:  Judge, other than we will respond to

17  the government's submission by whatever date you order.

18          THE COURT:  How about the middle of next week.

19          Then we can do some scheduling, Ellie.

20          THE CLERK:  That would be the government's

21  submission, I think you said the day after tomorrow, which is

22  the 14th.  And the defense, your submission.  Middle of next

23  week is Wednesday the 20th.

24          MR. MILLER:  If I can have until the 15th.  I think

25  I will be able to get it in by the 14th.

1      THE CLERK:  The 15th.  And the defense by the 20th,

2  your submission, middle of next week.

3      We can put it on for sentencing the following week:

4  Thursday the 28th at 10:00 a.m.

5      MR. GINSBERG:  Now we have a problem.

6      THE COURT:  What's the problem?

7      MR. GINSBERG:  I'm starting a trial.  I am disposing

8  of the one case I have before Your Honor that you felt might

9  be in trial.  I'm starting trial on the 26th before Judge

10  Swain in the Southern District.  That trial is likely to last

11  two weeks.

12      THE COURT:  She sits four days a week?

13      MR. GINSBERG:  I don't know yet how many days she's

14  going to sit.  I'll know that this afternoon.  I can notify

15  Your Honor.  We have a final pretrial conference today at

16  2:00.

17      THE COURT:  I can only focus so much on this, get it

18  in my head.  I think I understand it.  I don't want to do it

19  all over again.

20      MR. GINSBERG:  I have another trial scheduled on

21  February 16th before Judge Gleason, but I'm sure I can do the

22  sentence in-between.  Because frankly, I've also read this

23  material over and over again, and I think I can quote most of

24  it without reading it again.

25      THE COURT:  Monday the 25th.

U.S.A. v. SABARATNAM and THANIGASALAM                    23

1              THE CLERK:  You start the trial, you said, Tuesday

2      the 26th?

3              MR. GINSBERG:  Could we do it on the 25th.

4              THE CLERK:  Monday.

5              MR. GINSBERG:  Yes.  I guess we could, Your Honor.

6              THE COURT:  All right.  You are in the throes of

7      trial preparation; so what time would you like to do it?  Does

8      2:00 work?

9              MR. GINSBERG:  2:00 is fine.

10             THE COURT:  2:00 on the 25th.

11             Mr. Patella, does that work for you?

12             MR. PATELLA:  Judge, it does.

13             THE COURT:  All right.  Then unless there's anything

14     else, we will recess the proceedings and see you shortly.  And

15     thank you for input and your time today.

16             MR. PATELLA:  Thank you, Judge.

17             MR. GINSBERG:  Thank you, Your Honor.

18             MR. MILLER:  Thank you, Your Honor.

19             (Whereupon the matter concluded.)

20

21

22

23

24

25